## Denny's Adoption.

*J. Earle Ogle, D. P. Weimer* and *John P. Connelly*, for petitioners.

*Percy Allen Rose, Phillip N. Shettig, Arthur A. Nelson* and *Daniel G. Murphy*, for respondents.

REED, P. J., Aug. 27, 1928.—On June 11, 1927, Jacob Milton Murdock and Annie Y. Murdock, his wife, presented their petition, praying the court that an order be made decreeing that Jacob Milton Murdock Denny be adopted by them and "that he shall assume the surname of your petitioners, that is to say, he shall be hereafter known as Jacob Milton Murdock III, and that he shall have the rights of a child and heir of your petitioners," etc.

In accordance with the provisions of the act of assembly, the court fixed Wednesday, June 22, 1927, at 9.30 o'clock A. M., at the court-house in Ebensburg, as the time and place for a hearing on said petition, with an order that notice be directed to John Denny, the surviving father of the said Jacob Milton Murdock Denny, of the time and place of hearing.

On June 20, 1927, by agreement of counsel for the petitioners and counsel for John Denny, the hearing was continued until Tuesday, Aug. 2, 1927, at 9 o'clock A. M.

On Aug. 1, 1927, John Denny, the father of the said Jacob Milton Murdock Denny, presented his petition for a rule to show cause why the proceeding should not be dismissed and why the Act of Assembly of April 4, 1925, P. L. 127, whereunder the said petition was presented, should not be declared unconstitutional, and asking that, "pending the determination of the said rule, all proceedings on said petition for adoption to be stayed." No action was taken by the court on this petition, and on Aug. 2, 1927, a similar petition was presented, upon which no action was taken by the court. An answer was then filed on said Aug. 2, 1927, by John Denny, the father of Jacob Milton Murdock Denny, wherein he denied the matters set forth in the petition of Jacob Milton Murdock and Annie Y. Murdock, and especially denying that he had abandoned his son, and [averred] that the court had no jurisdiction to decree the prayed-for adoption in this case. The court then proceeded with the hearing and heard the evidence which was adduced by the parties in this proceeding.

The evidence on the part of the petitioners was to the effect that Jacob Milton Murdock Denny was ten years old on May 22, 1927, and that his mother was killed when he was twenty months old, or on Jan. 13, 1919. In

September, 1918, Mr. and Mrs. Denny and their child went to live with the Murdocks, and since that time this child had lived continuously with them up until May, 1927, when he was taken away for a short time and returned, and is still living with the Murdocks, the petitioners; that he has been in the care, custody and control of them all this time and that he is attending school, and that he has been provided for by them with the exception of a few presents, a few dollars which was occasionally given to him by his father, and a couple of suits of clothes which his father sent him when he was about five years old, on two different occasions. There was no objection at any time by the father to the continuance of the relationship which existed between the boy and his grandparents; in fact, the father lived with Mr. and Mrs. Murdock a number of months after the death of his wife, when he moved to the Fort Stanwix Hotel in the City of Johnstown, where the petitioners resided; after remaining there for some time, he went to Pittsburgh and was remarried. The evidence also discloses that after his remarriage he and his wife visited the petitioners, but, notwithstanding the fact that he had remarried and had his home in Pittsburgh, the father never asked the boy to come and live with him in his new home. It further appears that after having lived with his second wife for some time, she secured a divorce from him on the ground of infidelity.

The evidence further discloses that the petitioners are people who have the respect and confidence of the people in the community in which they reside; that their characters are irreproachable, and that their financial standing is such as to enable them to give this boy a good home, a good education and the best of moral and religious training; and, in fact, that is just what they have been doing for the boy up until the present time.

The evidence also discloses that on or about May 25, 1927, the father, who had been residing in New York City with his present wife (having been remarried again after being divorced from his second wife), came to the home of the Murdocks for the express purpose of discussing the adoption of the boy by the petitioners, at which time the father said that it was the only thing to do, stating that the matter had been troubling him for some months and that he wanted it done quickly and wanted the petitioners' lawyer to look after the matter. There was much more said at this time about the wonderful home that the boy had, and then it was agreed upon verbally that the adoption should be made.

Prior to May, 1927, according to the testimony, the father had not been to the home of the Murdocks to see his boy for several months. The evidence is not very clear as to whether or not he had been there since Christmas of 1926; it further appeared that during all the time that the boy had been with his grandparents there had never been any attempt on the part of the father to take the boy away from them, or to have him live in any other home or place. During all this time, with the exception of the matters heretofore referred to, the father never offered to, or attempted to, maintain, support or in any manner exercise any control over his son.

This testimony on the part of the petitioners was corroborated to some extent by other witnesses who were familiar with the facts in the case, and a great number of witnesses were also called whom it was admitted on the part of the respondent would have testified as to the character and reputation and financial standing of the petitioners in the community in which they lived.

There was considerable evidence adduced on the part of the petitioners which showed the moral delinquency of the father after the death of his first wife, during the time he lived with his second wife, and during the time he

was living with his present wife before their marriage, for the purpose of showing that the conduct of the father in connection with his lack of interest in the child's welfare by leaving him entirely in the custody and control of his grandparents, in pursuing a course of conduct which indicated his intention to abandon his child, and for the purpose of showing that it would be to the best interest of the child's welfare that he be adopted by his grandparents, the petitioners. This testimony was unanswered either by the father or his wife, and it was said by Judge Gawthrop of the Superior Court, in his opinion sustaining the lower court in the *habeas corpus* proceeding between the same parties: "At the hearing, the respondent produced testimony which abundantly established the fact that the father was not at that time a fit person to have the custody of the boy. It would serve no useful purpose to review the evidence supporting this conclusion. It is sufficient to remark that it discloses such a course of misconduct on the part of the father and his present wife as requires us to refuse to the father any control of the son at this time. Neither appellant nor his wife took the witness-stand for the purpose of refuting the charges against the former." Therefore, this court, in considering the case, must take as a verity all of the evidence in regard to the conduct and character of John Denny, the father of the boy, and it was held by the Court of Common Pleas of this county, in its opinion filed in the *habeas corpus* proceeding, in order to get possession of this child, "that the testimony, to say the least, raises a very grave doubt as to the fitness of the petitioner to have the custody of his child; that it is to the best interest of the child that it should remain in the custody of the respondent and his wife; that the petitioner (John Denny) has no legal right to the possession of the child in question."

. It is true the respondent did call some witnesses whose veracity could not be questioned to testify in his behalf as to what he did and as to what he had told them he did for his son. Of course, that part of the testimony as to what he told them he did cannot be considered on the ground of its being hearsay evidence; the other testimony, though, was regular and should be carefully considered, but it, in the main, supported the evidence of the petitioners as to what the father had done in the way of being interested in his boy, to the effect that he would visit him, send him some presents, and occasionally give him some money, but as we read this evidence carefully, there was no concrete, positive testimony which showed that John Denny, the father, during all these years, interested himself sufficiently to support, maintain or educate his child, or to provide another home for him, although he was in a position, especially while living in Pittsburgh, to have taken his son into his own home.

The question, then, which confronts the court under all these facts is whether or not the petitioners have made out a case in which the court is warranted in decreeing an adoption.

One of the serious questions in the case when the hearing was held was whether or not the Act of April 4, 1925, P. L. 127, was constitutional. This difficulty is out of the way because of the opinion of the Supreme Court in the case of Thompson's Adoption, 290 Pa. 586, wherein it has been held that this act is constitutional.

The other question is whether or not the evidence in this case will warrant the court in finding that the consent of the father is unnecessary by reason of his abandonment of his child. Section 2 of this act reads as follows:

"Consents Necessary to Adoption. Consent to the adoption is necessary, as follows:

"*(a)* Of the person proposed to be adopted if over twelve years of age, and of said person's husband or wife, if any.

"*(b)* Of the adopting parent's husband or wife, unless they jointly adopt such person.

"*(c)* Of the parents or surviving parent of the person proposed to be adopted, except that in the case of an illegitimate child the consent of the mother only is necessary, unless the father has acknowledged such child; but the consent of a parent who has been adjudged a lunatic or habitual drunkard or who has abandoned the child is unnecessary, provided such fact is proven to the satisfaction of the court or judge hearing the petition, in which case such court or judge shall so find as a fact."

Section 4 provides: "If satisfied that the statements made in the petition are true and that the welfare of the person proposed to be adopted will be promoted by such adoption, and that all the requirements of this act have been complied with, the court or judge shall make a decree so finding and reciting the facts at length and directing that the person proposed to be adopted shall have all the rights of a child and heir of such adopting parent, or parents, and be subjcet to the duties of such child; but otherwise shall make a decree refusing the adoption and dismissing the petition."

It will be seen, therefore, that there are two requirements to be proven on the part of the petitioners before an adoption can be decreed. The first is, the abandonment must be proven; and, second, this abandonment must be proven to the satisfaction of the court, and the court must so find as a fact. Therefore, the fitness of the adopting parents cannot enter into the case unless the evidence warrants the court in finding that the father by his course of conduct towards his son warrants it in finding that he had abandoned his child. Abandonment in its most general acceptance of the term means to depart from without any care as to what becomes of the object abandoned, and the courts have defined it in various terms.

In the case of Beech's Adoption, 7 D. & C. 505, Judge Trimble, on page 507, states:

"In Pennsylvania, from June 11, 1879, until the passage of the Adoption Act of 1925, desertion of children by parents destroyed all their natural rights, because adoption followed as if they were dead: Act of June 11, 1879, § 10, P. L. 142. Section 1 of the Act of May 19, 1887, P. L. 125, authorized adoption when the parents, from drunkenness, profligacy or other causes, neglected or refused to provide for children for a year or upwards and the child's representative gave consent. The Act of 1925 does not affect parents' rights until it is found by decree that the parents are insane or habitual drunkards or that they have abandoned their children.

"In Booth *v.* Van Allen, 7 Phila. 401, abandonment is defined: 'To forsake entirely; to renounce and forsake—to leave with a view never to return.' There are other similar definitions, as in 1 Corpus Juris, 3: 'To renounce all care or protection of; totally to withdraw ourselves from an object; to lay aside all care for it; to leave it altogether to itself.'

"These definitions do not have sufficient extent of meaning to reach all the conditions in which abandonment may occur, for it is not difficult to see how the submission of children to debauchery, depravity or vice without dissolution of family ties and separation of parents from them will leave the same, or, perhaps, worse effects than forsaking with an intention never to return."

Many cases have been cited as to what will amount to an abandonment by counsel both for petitioners and respondent, but a summing up of all of these cases brings the court to the conclusion that every finding must depend on

the particular facts as shown in the case before the court. A careful study of the authorities cited by counsel for petitioners, as well as counsel for respondent, shows that the courts of the different states are almost evenly divided on the question as to what constitutes abandonment, and it is necessary for this court to decide on which line of cases it will follow, as this question has not been squarely before the appellate courts of our State. We do have, however, the opinion of Judge Thompson, of the Orphans' Court of Philadelphia County, in the case of Bonnem's Adoption, 8 D. & C. 146, wherein, on page 147, it is said: "It is needless to say that a court should approach a question of this kind with much caution, as the natural right of a father should not be taken away from him without sufficient cause, but the Adoption Act also requires us to consider the welfare of the child. Applying the reasons and conclusions of law set forth in Kelly's Adoption, 6 D. & C. 506, and Beech's Adoption, 7 D. & C. 505, in both of which cases the subject under consideration was discussed at great length, to the facts of this case, we are of the opinion that Carl O. Bonnem has abandoned his child, Bannard Bonnem, within the meaning of the Adoption Act of April 4, 1925, P. L. 127, and that the welfare of the 'person proposed to be adopted will be promoted by such adoption.' "

In the case of Winans v. Luppie, 47 N. J. Eq. 302, 20 A. 969, it was said by Judge Dixon, of the Appellate Court, in a case very similar to the one at bar: "We are, therefore, brought to the second question in the cause, whether the mother had abandoned the child and so rendered it inessential to obtain her written consent to the adoption. The statutory notion of abandonment does not necessarily, we think, imply that the parent had deserted the child or even ceased to feel any concern for its interests. It fairly may, and in our judgment does, import any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child. Such a purpose, clearly manifested, certainly forms a more reasonable ground for permitting judicial discretion to decide whether another may assume these claims and duties than the signature of the parent, which a mere impulse may induce. It does not follow that the purpose may not be repented of, and in proper cases all parental rights again acquired, including this statutory right of preventing adoption by withholding consent; but, when once the abandonment is shown to have existed, it becomes a judicial question whether it really has been terminated or can be consistently with the welfare of the child. When, in pursuance, perhaps, of the abandonment, new ties have been formed and a new station in life has been taken by the child, it might be unjust that, solely because of the parent's caprice, legal sanction should be refused to the new conditions. Under such circumstances, a court might lawfully deem the abandonment irrevocable, so far as the claims of the parents were concerned." And Judge Dixon, after reciting the facts in the case, finally concludes: "She had, therefore, within the statutory sense, abandoned her child, and her consent was not legally necessary to the adoption. For these reasons, we think the decree of the Prerogative Court should be reversed and the decree of the Orphans' Court be affirmed. Unanimously reversed."

In the case of Wood v. Wood, 77 N. J. Eq. 593, 77 A. 91, it was held in the *per curiam* opinion (quoting from the syllabus) that: "A girl six years old was placed by the father, with the mother's consent, in the care of her aunts, with the intention of having her brought up and educated by them. She had a good home, loved her aunts and was loved by them, and was brought up in a much better condition of life than was within the power of her parents to

afford. The conduct of the father and mother during all the time she was there, and of the mother after the father's death, showed their confidence in the aunts and belief that it was for the child's welfare to remain there. Her father died leaving a large family in poor circumstances; the mother supporting the family by working, making $10 or $12 a week. The mother made no objection to the method of the child's bringing up, but after the father's death forcibly seized the child and took her away, apparently to make use of her and to have her 'rough it' at home with her younger sisters. *Held*, that the child's interest required that she should be kept by her aunts.

"Where the conduct of parents indicated their settled intention to forego parental rights and to leave their child permanently in the care of her aunts, though there was no actual abandonment of the child by the mother, her acts constituted 'abandonment' within P. L. (New Jersey) 1902, page 259, as amended by P. L. 1905, page 272, providing that any unmarried person of full age may petition the Orphans' Court of the county in which a minor child may reside for permission to adopt such child, and that if either parent shall have abandoned the child, the consent of the other parent shall be sufficient, so that the mother's consent was not necessary to an adoption of this child by her aunts."

The petitioners in the case at bar have presented a much stronger case by the proven facts than either of the above-cited New Jersey cases, and if the welfare of the child is to be taken into consideration, and that seems to be one of the controlling features in the State of New Jersey under its statute, which is somewhat similar to our own, as well as in several of the other states, there can be no question but what the petitioners in this case should be permitted to adopt this child. No one can read the evidence in this case from an impartial standpoint and say that the welfare of this boy would not be greatly promoted if adopted by the petitioners. Furthermore, the boy, who was past ten years of age at the time he testified, unhesitatingly said that he preferred to stay with and be adopted by his grandparents.

In Corpus Juris, § 98 *C*, page 1389, we find the following: "Welfare of Child Primary Consideration. In adoption proceedings, the child is regarded as the ward of the court, and the court has ample authority to make a full examination of all the circumstances of the case. The welfare of the child is the primary consideration, and the court, in its discretion, may grant or deny a petition for adoption." And on page 1393 we find the following: "Welfare of Child. The welfare of the child is ordinarily the controlling circumstance in applications of this nature. Where it appears upon joint petition of the natural and adoptive parents that the welfare of the child will be promoted by a revocation of the adoption, an order for revocation will be made."

It appears, therefore, that, by the weight of the authorities, it is the duty of the court to weigh and consider the welfare of the child, and while an adoption may not be had unless the evidence would warrant the court to find as a fact by reason of the conduct of the parent that the child had been abandoned, yet we hold that the welfare of the child also should be very carefully considered by the court before an adoption is allowed.

After a careful review of all of the evidence in this case, we are constrained to believe, and therefore find, that John Denny left his boy, Jacob Milton Murdock Denny, with his grandparents with the intention that they should have, keep, support, educate and control this child without any interference on his part; and we further find that during all the years that the said Jacob Milton Murdock Denny was permitted to remain with his grandparents and be supported and schooled by them, John Denny pursued a course of conduct

through his moral turpitude and neglect of said boy by permitting him to remain in the possesssion of his grandparents without offering to furnish him another home after he was remarried and had a home of his own in which to take him; without paying anything towards his support; without evincing any considerable interest in his education or his religious training; and by going away without notifying either his son or the grandparents as to his whereabouts; by remaining away from upwards of eight or nine months without writing to his son or the grandparents, or without in any manner apprising them as to his whereabouts; combined with his silence at the time of the hearing when he was charged with abandoning his son, which is sufficient to warrant this court in declaring as a matter of fact and law that the said John Denny abandoned his son within the meaning of the provisions of the act under which these proceedings were instituted.

We further find that the welfare of the said Jacob Milton Murdock Denny will be promoted by the adoption of him by Jacob Milton Murdock and Annie Y. Murdock, his wife, and that all of the exceptions to the decree for an adoption in this case should be overruled, and that the prayer of the petitioners for the adoption of the said Jacob Milton Murdock Denny should be decreed, and in accordance with the above findings of fact and conclusions of law, the court makes the following decree of adoption:

### Decree.

And now, Aug. 27, 1928, the court finds as a fact that the welfare of Jacob Milton Murdock Denny, the person proposed to be adopted, will be promoted by such adoption, and that all of the requirements of the Act of April 4, 1925, have been complied with; it, therefore, makes the following

### Decree of adoption.

And now, to wit, Aug. 27, 1928, it appearing to the satisfaction of the court that the statements made in the petition are true and that the welfare of the said Jacob Milton Murdock Denny, the person proposed to be adopted, will be promoted by such adoption, and that all of the requirements of the Act of April 4, 1925, relating to adoption petitions in adoption proceedings, have been complied with, it is ordered and decreed that the said Jacob Milton Murdock Denny be adopted by the said Jacob Milton Murdock and Annie Y. Murdock, his wife, and shall have all the rights of a child and heir of such adopting parents and be subject to the duties of such child; it is further decreed that the said Jacob Milton Murdock Denny shall assume the name of the adopting parents, to be known as Jacob Milton Murdock III.

From Henry W. Storey, Jr., Johnstown, Pa.